UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHERYL PRIMM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 3:12-cv-0305** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

<u>**REPORT AND RECOMMENDATION**</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the

Social Security Administration (the "SSA"), through its Commissioner, denying Plaintiff's

application for supplemental security income ("SSI") under Title XVI of the Social Security Act

(the "Act"), 42 U.S.C. §§ 1382, 1382c. For the reasons explained below, the Magistrate Judge

**RECOMMENDS** that Plaintiff's Motion for Judgment on the Administrative Record (DE 12) be

**DENIED** and the Commissioner's decision be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff applied for SSI on May 11, 2009, claiming she was unable to work because of

her bipolar disorder, depression, and severe anxiety. (DE 10, pp. 56, 66).[1] However, Disability

Determination Services ("DDS") had insufficient information to assess Plaintiff's mental

condition because Plaintiff did not submit questionnaires about her work and activities of daily

living ("ADL"). (DE 10, pp. 66, 235-247). DDS denied Plaintiff's initial request on August 3,

2009. (DE 10, pp. 62-64). On September 15, 2009, Plaintiff requested DDS reconsider her SSI

---

[1] Page citations refer to the Bates Stamp on each page of the Administrative Record.

application, this time adding hip pain to her list of complaints. (DE 10, pp. 57, 70, 72). Noting

that Plaintiff did not take the DDS-ordered physical consultative exam, DDS again denied

Plaintiff's SSI application on April 19, 2010. (DE 10, pp. 70-72).

On May 26, 2010, Plaintiff requested a hearing before an Administrative Law Judge (an

"ALJ"). (DE 10, pp. 73-74). The hearing occurred on July 13, 2011. (DE 10, pp. 24-51, 84-98).

Plaintiff was represented by William Taylor. (DE 10, p. 24). Lisa Courtney, R.N., attended the

hearing as a Vocational Expert ("VE"). (DE 10, p. 24). On August 5, 2011, the ALJ issued an

unfavorable decision, denying Plaintiff's SSI application. (DE 10, pp. 9-20). The ALJ provided

the following findings of fact and conclusions of law:

> (1) The claimant has not engaged in substantial gainful activity ("SGA") since May 11, 2009, the application date.
>
> (2) The claimant has the following severe impairments: bipolar disorder, anxiety disorder, migraine headaches, and left hip spurs.
>
> (3) The claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.
>
> (4) The claimant has the residual functioning capacity ("RFC") to perform light work, meaning she can lift twenty pounds occasionally and ten pounds frequently. She can stand or walk for only five hours out of an eight-hour day, and she must be able to alternate between sitting and standing at will. She can only do simple, routine, repetitive tasks, and she can have occasional contact with the public and co-workers. Workplace changes must be gradual and infrequent.
>
> (5) The claimant has no past relevant work.
>
> (6) The claimant was forty-nine years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age.
>
> (7) The claimant has at least a high school education and is able to communicate in English.

(8) Transferability of job skills is not an issue because the claimant does not have past relevant work.

(9) Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(10) The claimant has not been under a disability, as defined in the Act, since May 11, 2009, the date the application was filed.

(DE 10, pp. 14-19).

Plaintiff subsequently requested that the Appeals Council review the ALJ's decision on October 3, 2011. (DE 10, p. 7). On January 26, 2012, the Appeals Council denied Plaintiff's request for review. (DE 10, pp. 1-6).

Plaintiff filed her complaint on March 27, 2012. (DE 1). Defendant filed an answer and the SSA administrative record on May 29, 2012. (DE 9; DE 10). The following day, the Magistrate Judge ordered Plaintiff to file a motion for judgment on the administrative record and ordered Defendant to respond. (DE 11). Plaintiff filed her motion on June 25, 2012. (DE 12). Defendant responded on July 25, 2012. (DE 13). Plaintiff replied on July 30, 2012. (DE 14).[2]

## II. REVIEW OF THE RECORD

### A. MEDICAL EVIDENCE

Plaintiff submitted a disability report to DDS on May 18, 2009. (DE 10, pp. 124-130). She claimed to suffer from: a bipolar disorder, depression, severe anxiety, a fear of leaving her house, and agoraphobia. (DE 10, p. 125). She listed her treating physicians from 1998 to 2009 as Mid South Psychiatric Associates in Murfreesboro, Tennessee, and StoneCrest Family

---

[2] The scheduling order in this case (DE 11) provides for a reply. For some reason, Plaintiff's counsel filed a motion for permission to file a reply. (DE 14). Unfortunately, this took the case off the schedule until that motion was ruled on, and the case dropped through the cracks for some time. To promote expediency and clarity, Plaintiff's counsel is reminded to read and comply with the scheduling order. In the future, if a matter seems to be unreasonably delayed, counsel should feel free to file a motion to ascertain the status of the case. Local Rule 7.01(c). The Magistrate Judge will normally submit a Report and Recommendation in Social Security cases within six months of the reply.

Physicians in Smyrna, Tennessee. (DE 10, p. 127). Plaintiff reported no side effects from her prescriptions, which consisted of: Invega and Xanax for anxiety, Lovaza for cholesterol, Methadone for pain, and Zoloft for her bipolar disorder. (DE 10, p. 128).

After DDS rejected Plaintiff's initial SSI request, Plaintiff submitted a disability report on appeal to DDS on September 24, 2009. (DE 10, pp. 131-137). Plaintiff declared that her agoraphobia, depression, and hip pain had worsened as of August 1, 2009, and that she could no longer leave her house without medication and her husband. (DE 10, p. 132). Plaintiff also stated that she could not clean her house because of hip pain. (DE 10, p. 135). Mid South Psychiatric Associates and StoneCrest Family Physicians were still treating Plaintiff, and Plaintiff's medication included: Alprazolam and Invega for anxiety, Lovaza for cholesterol, Methadone and Tramadol for pain, Vitamin D for anemia, and Zoloft for her bipolar disorder; again, she noted no side effects. (DE 10, pp. 133-134).

Plaintiff submitted a function report to DDS on November 18, 2009. (DE 10, pp. 146-153). She reported that her daily routine consisted of sleeping fifteen to twenty hours, remaining in her pajamas, and watching television. (DE 10, pp. 146-147). Plaintiff stated that she used the phone two to three times a week, could not prepare meals because of hip pain, and bathed twice a week with her husband's assistance getting into and out of the tub. (DE 10, pp. 147-150).

Plaintiff submitted another disability report to DDS on May 1, 2010. (DE 10, pp. 158-165). She reported that she could not walk or stand for over ten minutes. (DE 10, p. 162). In addition to being treated by Mid South Psychiatric Associates and StoneCrest Family Physicians, Plaintiff reported that she had been treated by Dr. Pelmore[3] regarding her SSI application on April 10, 2010. (DE 10, pp. 159-161). Plaintiff stated that the "SSI" sent her for a hip x-ray and EKG, exercise, vision, and breathing tests on April 10, 2010. (DE 10, p. 162). Plaintiff listed her

---

[3] The record does not indicate where Dr. Pelmore works.

prescriptions as: Tamazepam for sleep, Alprazam for anxiety, Zoloft for her bipolar disorder, Methadone for pain, and Lyrica for depression. (DE 10, p. 161).

Ravi Singh, M.D. ("Dr. Singh") from Mid South Psychiatric Association treated Plaintiff's mental health problems from November 26, 1997 to February 28, 2011. (DE 10, pp. 175-234, 249-250, 311-333). Plaintiff started seeing Dr. Singh after she moved and began decompensating[4] after being off medication for two months. (DE 10, p. 233). Dr. Singh noted the impression that Plaintiff suffered from post-traumatic stress disorder ("PTSD") (DE 10, pp. 214-215) and bipolar disorder.[5] However, Dr. Singh did not report any evidence of psychosis. Dr. Singh noted that Plaintiff's husband accompanied Plaintiff to her appointments. (DE 10, p. 200).

Dr. Singh reported that Plaintiff might have PTSD from the violence in her background, which included: Plaintiff's father who was incarcerated for most of her life and had a history of psychotic behavior and cutting himself, being attacked and threatened as a child, and being verbally and sexually abused by her grandmother. (DE 10, pp. 215, 233). In 1997, Plaintiff told Dr. Singh that she had nightmares about the sexual abuse. (DE 10, p. 233).

Dr. Singh noted mental disturbances and suicidal ideations on several occasions. Although Plaintiff denied suicidal ideation on December 18, 1998, she reported to Dr. Singh that if she did not get her weight under control "she would rather die." (DE 10, p. 227). During an appointment on September 27, 2004, Plaintiff's husband reported that Plaintiff had become "very manic" for a day. (DE 10, p. 200). On April 23, 2007, Dr. Singh noted that Plaintiff was under extreme stress and had put a gun in her mouth the prior Saturday but that Plaintiff was not

---

[4] Episodes of decompensation include "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(C)(4).

[5] (DE 10, pp. 175-182, 184-222, 224-234, 249-250, 311, 314, 317, 319, 322, 324, 327).

suicidal during the present appointment. (DE 10, p. 190). On January 21, 2008, Plaintiff told Dr. Singh that she had superficially cut herself on Christmas Eve. (DE 10, p. 185). Plaintiff was noted as being suicidal at times on February 9, 2009 and January 5, 2009. (DE 10, pp. 177-178). On August 9, 2010, Plaintiff met with Dr. Singh because Plaintiff had been decompensating since July 26, 2010. (DE 10, p. 319). During this visit, Plaintiff reported that she had difficulty sleeping, was crying, had migraines, had shaking hands, and had experienced a nervous breakdown. (DE 10, p. 320). Dr. Singh noted that Plaintiff's son was the main issue. (DE 10, p. 319).

The record contains minimal evidence regarding Plaintiff's hip injury. On March 22, 1999, Plaintiff reported hip problems to Dr. Singh and stated she would see a specialist. (DE 10, p. 225). Dr. Singh noted that Plaintiff was unable to exercise due to her hip problem on September 11, 2006. (DE 10, p. 193).

Dr. Singh regularly adjusted Plaintiff's medications, which alternated between: Seroquel, Seroquel XR, Zoloft, Cymbalta, Geodon, Invega, Xanax, Ambien, Elavil, Risperdal, Depakote, Effexor, Restoril, Temazepam, Saphris, Lyrica, and Wellbutrin SR. (DE 10, pp. 175-234, 249-250, 311-332). These prescriptions were adjusted in response to Plaintiff's complaints that they made her cry, upset her stomach, and caused weight gain, mood swings, hyperactivity, nightmares, hallucinations, and insomnia.[6] On March 22, 2010, Plaintiff reported that she had not slept so well in two to three years and that she finally felt almost no anxiety. (DE 10, p. 325).

Plaintiff had few problems complying with her medication prescriptions. On March 3, 2002, Plaintiff told Dr. Singh that she obtained Methadone from her brother without a prescription to relieve her back and hip pain. (DE 10, p. 214). On January 6, 2003, Plaintiff admitted she was not taking her Risperdal prescription. (DE 10, p. 208). Upon hearing that

---

[6] (DE 10, pp. 175-184, 188, 194, 203-204, 206, 208, 210, 212-213, 220, 227-228, 324).

Plaintiff smoked weed in 2003, Dr. Singh advised Plaintiff to stay away from illicit drugs because they would interfere with Plaintiff's prescriptions. (DE 10, p. 204).

On January 18, 2010, Dr. Singh referred Plaintiff to Ahmed Farooque, M.D. ("Dr. Farooque") to determine whether electroconvulsive therapy ("ECT") would benefit Plaintiff. (DE 10, p. 329). Dr. Farooque's diagnostic impression was of bipolar affective disorder, chronic back pain, and a global assessment of functioning ("GAF") score of 45.[7] (DE 10, p. 330). On February 22, 2010, Plaintiff told Dr. Singh that the ECT caused severe headaches and memory loss and that she would not continue the sessions. (DE 10, p. 327).

StoneCrest Family Physicians treated Plaintiff from December 3, 2007 to March 14, 2011. (DE 10, pp. 251-288, 334-356). Its physicians[8] regularly prescribed Methadone to treat Plaintiff's chronic hip, knee, and back pain,[9] and Imitrex to treat Plaintiff's migraines and headaches. (DE 10, pp. 261, 264-265, 271, 343, 352).

Plaintiff reported anxiety in February 2009 and October 2009. (DE 10, pp. 251, 267). On March 8, 2010, Plaintiff reported feeling increasingly anxious after undergoing ECT. (DE 10, p. 352). Plaintiff reported that she was less anxious on April 5, 2010. (DE 10, p. 351). At that time, she was taking Lyrica and Xanax. (DE 10, p. 351). Continuing to take Lyrica and Xanax, Plaintiff again reported anxiety in May 2010, and Plaintiff reported anxiety while taking Lyrica in March 2011. (DE 10, pp. 334, 349-350).

---

[7] The GAF scale indicates an individual's mental health on a sliding continuum ranging from 0 to 100. A score between 41 and 50 indicates serious symptoms or serious functioning impairments in social, occupational, or school functioning. Symptoms may include suicidal ideation, severe obsession rituals, and frequent shoplifting. Functional impairments may include not having friends and an inability to keep a job. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006); *see also Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

[8] The names of the treating physicians are not apparent from the record, and they are herein referred to as "physicians."

[9] (DE 10, pp. 251, 253, 255, 257, 259, 261-262, 265, 267, 269, 271, 273, 275, 277-278, 280, 282-283, 285, 334-336, 342-346, 348-356).

Plaintiff reported insomnia From August 2008 to January 2009. (DE 10, pp. 269, 271, 277-278). Seroquel helped Plaintiff sleep in February 2009. (DE 10, p. 267). Plaintiff again reported insomnia in August 2010 and March 2011. (DE 10, pp. 334, 345).

Plaintiff's physician identified a bipolar disorder in September 2008, June 2009, August 2010, and September 2010. (DE 10, pp. 259, 275, 344-345). Plaintiff treated her bipolar disorder with Lyrica in August 2010 and September 2010. (DE 10, pp. 344-345).

The physicians noted that Plaintiff suffered from depression from July 2008 to February 2010.[10] Plaintiff treated her depression with Zoloft in July 2008. (DE 10, p. 280). In October 2008, Plaintiff was not taking her anti-depressant medication, Abilify. (DE 10, p. 273). Plaintiff next treated her depression with Cymbalta in November 2008 and January 2009. (DE 10, pp. 269, 271). On February 9, 2009, the physician noted that Plaintiff's depression was managed by her psychiatrist, and on March 8, 2010, Plaintiff reported that she had completed two ECT treatments but stopped because she could not tolerate them. (DE 10, pp. 267, 352).

## B. CONSULTATIVE ASSESSMENTS

On July 31, 2009, Jayne Dubois, Ph.D. ("Dr. Dubois") completed Plaintiff's Psychiatric Review Technique ("PRT"). (DE 10, pp. 235-248). She noted that she had insufficient evidence to make a determination because Plaintiff had not returned the ADL form. (DE 10, p. 247).

On February 3, 2010, P. Jeffrey Wright, Ph.D. ("Dr. Wright") completed a new PRT. (DE 10, pp. 289-302). Dr. Wright stated that Plaintiff suffers from a medically determinable impairment—Bipolar I disorder. (DE 10, pp. 292, 301). He concluded that Plaintiff is independent in self-care ADL, which includes taking her medication and being able to count change. (DE 10, pp. 301). He also noted that Plaintiff is unable to drive, cook because of her hip pain, or do chores due to pain and depression. (DE 10, p. 301). According to Dr. Wright, Plaintiff

---

[10] (DE 10, pp. 251, 259, 264-265, 267, 269, 271, 273, 275, 280, 353, 356).

is able to perform ADL without significant interruption or an unreasonable number of breaks. (DE 10, p. 301). Dr. Wright reported that Plaintiff is mildly limited in conducting ADL, has no episodes of decompensation of extended duration, and is moderately limited regarding maintaining social functioning and concentration, persistence, or pace. (DE 10, p. 299). Dr. Wright decided Plaintiff's statements regarding her symptoms and functional limitations were partially credible since the alleged severity was not entirely consistent with the objective evidence. (DE 10, p. 301).

Dr. Wright also assessed Plaintiff's mental RFC on February 3, 2010. (DE 10, pp. 303-306). He concluded that Plaintiff can understand, remember, and concentrate on simple and detailed 3-step tasks for at least two hours in an eight-hour day with at most moderate limitations. (DE 10, p. 305). He further determined that Plaintiff can adapt to infrequent workplace changes and appropriately interact with the public, supervisors, and co-workers with at most moderate limitations. (DE 10, p. 305).

At DDS's request, Roy Johnson, M.D. ("Dr. Johnson")[11] examined Plaintiff on April 10, 2010. (DE 10, pp. 307-310). Plaintiff reported that she has agoraphobia, does not like to go outside or around people, only goes to her doctor's offices and a beauty shop, is unable to stand or sit for prolonged periods of time, primarily stays in bed, fell on her hip in 1992, fractured her right ankle and foot, and had no knee problems. (DE 10, p. 307). Dr. Johnson noted that Plaintiff was alert and oriented times three[12] and was in no acute distress. (DE 10, p. 308). Dr. Johnson's

---

[11] Although Plaintiff states Dr. Pelmore examined her (DE 10, p. 159), Dr. Johnson transcribed and signed the exam notes. (DE 10, pp. 307-309). The physician for this office visit, location unknown, will herein be referred to as Dr. Johnson.

[12] Oriented times three means an individual can state who she is, where she is, and what time it is.

impression was hypercholesterolemia,[13] bipolar disorder, depression, anxiety, and a history of chronic pain. (DE 10, p. 309). He noted that Plaintiff may occasionally lift twenty-five to thirty pounds, stand and walk for five hours with alternative sitting or standing without sitting restrictions, and should continue to see her treating physicians. (DE 10, p. 309).

On April 16, 2010, Gina Hobock ("Ms. Hobock"), a vocational examiner, completed a vocational analysis worksheet regarding Plaintiff's functioning abilities. (DE 10, pp. 154-156). Ms. Hobock found that Plaintiff was moderately limited in: her ability to understand, carry out, and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (DE 10, p. 154). Ms. Hobock found that Plaintiff only had mental restrictions and should be able to perform the duties of a store laborer, a production assembler, and a surveillance system monitor. (DE 10, p. 156).

## C.  PLAINTIFF'S TESTIMONY

Plaintiff testified that she could read and write, had a driver's license, was a licensed aesthetician, and had not worked within the last fifteen years. (DE 10, pp. 29-31).

During the hearing, Plaintiff testified that several of her physical and mental health issues stemmed from a car-jacking in 2001-2002 where she was shot in the head and leg. (DE 10, pp. 31, 35-36, 42-43). She testified that she stopped driving her car after this incident and had

---

[13] Excessive cholesterol in the blood. *See* Elsevier Saunders, <u>Dorland's Illustrated Medical Dictionary</u> 887 (32nd ed. 2012).

tension headaches or migraines about every other day since the incident. (DE 10, pp. 31, 42-43). Plaintiff also testified that she developed post-traumatic stress disorder ("PTSD") after this event. (DE 10, pp. 35-36). According to Plaintiff, her PTSD caused agoraphobia which prevents her from leaving her house unless she is with her husband. (DE 10, p. 36).

Plaintiff testified that she leaves her house with her husband once a month to see her doctor, once every three months to see her psychiatrist, and once every four months to visit the beauty shop. (DE 10, pp. 31, 36). When the ALJ noted that the record did not contain any information about the car-jacking or the injuries Plaintiff alleged, Plaintiff testified that her doctors knew about the incident. (DE 10, p. 41).

Plaintiff testified that she has experienced three to four panic attacks a week since she was a child. (DE 10, p. 35). According to Plaintiff, the severity of these attacks varies, and she testified that one caused her to pass out in public. (DE 10, p. 35). Plaintiff testified that she carries an inhaler and takes Xanax to control her anxiety but that the Xanax only stops her shaking and does not prevent panic attacks. (DE 10, pp. 35, 44).

Plaintiff testified that her anxiety, panic attacks, and PTSD make sleeping difficult and that she had nightmares while taking Ambien. (DE 10, p. 36). Plaintiff testified that she does not have problems with paranoia when she is at home. (DE 10, p. 37). Plaintiff also testified that she went through two sessions of electric shock therapy in the 2011 but stopped because the pain made her want to commit suicide. (DE 10, pp. 38-39).

Plaintiff testified that she had harmed herself in the past, claiming she once took enough pills to kill four horses and had cut her wrists four or five times, most recently five weeks prior. (DE 10, pp. 39-40).

Plaintiff testified that in the early 1990s she broke one foot and both ankles and suffered muscle and nerve damage in her hip after falling from a ladder. (DE 10, pp. 40, 44). Plaintiff additionally testified that her foot hinders her ability to work, mentioning the difficulty her doctor had in taking an x-ray of her foot. (DE 10, pp. 49-50).

### D. VOCATIONAL EXPERT'S TESTIMONY

The ALJ first asked the VE whether jobs were available for an individual with no past relevant work, the same age and education as Plaintiff, requiring a light exertional level of work, standing and walking limited to a total of five out of eight hours, a sit-stand at will option throughout the eight-hour workday, simple and routine tasks, occasional contact with the public and coworkers, and gradual and infrequent changes in the workplace, if any. (DE 10, p. 47). The VE testified that there are jobs in the light, unskilled labor market and that the number of jobs would be reduced in half due to the sit-stand and the reduced walking requirements. (DE 10, p. 47). According to the VE, available jobs include: a sheet packer, an inspector, and an assembler. (DE 10, pp. 47-48).

The VE testified that unskilled jobs would not be available to an individual who needed to miss two or more days of work per month or to an individual unable to sustain attention, concentration, persistence, and pace for periods of up to one hour in an eight-hour workday. (DE 10, p. 48). The VE also testified that no jobs would be available for an individual unable to leave her house more than once a month. (DE 10, p. 49). When the ALJ asked the VE if her testimony was consistent with *The Dictionary of Occupational Titles* (the "DOT"), the VE confirmed that it was, aside from the "sit-stand" option. (DE 10, p. 49).

# III. CONCLUSIONS OF LAW

## A. STANDARD OF REVIEW

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013), reh'g denied (May 2, 2013). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Though substantial evidence might support an opposite conclusion, this Court defers to the Commissioner's decision if the Commissioner had more than a "mere scintilla of evidence but less than a preponderance." *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Failure to comply with the proper legal standards implies a lack of substantial evidence. *Gayheart*, 710 F.3d at 374.

## B. PROCEEDINGS AT THE ADMINISTRATIVE LEVEL

A claimant may obtain SSI upon proving she is "disabled" within the meaning of the Act. 42 U.S.C. § 1381a. More specifically, she must prove she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The SSA assesses disability under this five-step test:

> (1) If the claimant is doing SGA, the claimant is not disabled.
>
> (2) If the claimant's physical or mental impairment, or combination of impairments, is not severe or does not meet the duration requirement, the claimant is not disabled.
>
> (3) If the claimant's impairment(s) meets or equals a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1, the claimant is presumed disabled, and the inquiry ends.

> (4) Based on the claimant's RFC, if the claimant can still perform past relevant work, the claimant is not disabled.
>
> (5) If the claimant's RFC, age, education, and work experience indicate that the claimant can perform other work, the claimant is not disabled.

20 C.F.R. § 416.920(a)(4).

The claimant bears the burden of proof for the first four steps. *Carrelli v. Comm'r Of Soc. Sec.*, 390 F. App'x 429, 435 (6th Cir. 2010). At step five, the burden shifts to the SSA, and it may meet this burden by providing evidence of a "significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile." *Id.*

### C. PLAINTIFF'S STATEMENT OF ERRORS

Plaintiff claims the ALJ erred when he: (1) concluded that Plaintiff did not meet or medically equal any listed impairments; (2) did not list Plaintiff's PTSD as a severe impairment; (3) did not call a Medical Expert ("ME") to testify; (4) did not address conflicting information from the VE and the DOT; and (5) did not find Plaintiff's testimony completely credible. (DE 12-1, pp. 1-2, 6-14).

#### 1. Plaintiff Does Not Suffer From a Listed Impairment or Its Medical Equivalent

An individual is presumptively "disabled" if she suffers from an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1, or a medically equivalent impairment. 20 C.F.R. § 416.920(a)(4)(iii). Plaintiff argues she is entitled to a disability status under Listing 12.04 (Affective Disorders) and Listing 12.06 (Anxiety Related Disorders) because of her suicidal tendencies, hypomanic moods or episodes, weight changes, hallucinations, fear of driving, rarely leaving the house, paranoia, panic attacks, insomnia, moods swings, blunt affect, dysphoric mood, and staying in bed for several days at a time. (DE 12-1, pp. 6-8).

To fall under Listing 12.04, the applicant must prove that she satisfies requirements (A and B) or just (C). Listing 12.06 requires the applicant prove she satisfies either (A and B) or (A and C). Impairments must be established through medical evidence, including symptoms, signs, and laboratory findings. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(B). The severity of these impairments depends on the degree of the functional limitations imposed. *Id.* at 12.00(C); 20 C.F.R. § 416.920a(c). "The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(A).

Essentially at issue is whether the ALJ erred in concluding that Plaintiff did not satisfy 12.04(B), 12.06(B), and 12.06(C). Plaintiff does not argue that she satisfies 12.04(C). (DE 12-1, p. 9). Listing 12.04(B) and 12.06(B) both require at least two of the following: *marked* restriction of ADL; *marked* difficulties in maintaining social functioning; *marked* difficulties in maintaining concentration, persistence, or pace; or *repeated* episodes of decompensation, each of extended duration. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.04(B), 12.06(B) (emphasis added).

A marked restriction is more than moderate but less than extreme and is signaled if an individual's impairment seriously interferes with her ability to function independently, appropriately, and effectively on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00(C). ADL include but are not limited to cleaning, shopping, cooking, hygiene, and maintaining a residence. *Id.* at 12.00(C)(1). Social functioning refers to the claimant's ability to interact with and get along with others. *Id.* at 12.00(C)(2). Concentration, persistence, or pace considers whether the claimant can focus long enough to complete a task typically found in a work setting. *Id.* at 12.00(C)(3). Episodes of decompensation must occur three times within a year or on average every four months, each episode lasting for at least two weeks. *Id.* at 12.00(C)(4).

Listing 12.06(C) requires a finding that the applicant is completely unable to function independently outside of her home. *Id.* at 12.06(C).

As required by 20 C.F.R. § 416.920a(d)(2), when determining that Plaintiff did not suffer from a listed impairment or its medical equivalent, the ALJ considered the medical findings regarding Plaintiff's severe impairments and the functional limitations they imposed. The ALJ specifically referenced: (1) Plaintiff's testimony, (2) medical reports from Mid South Psychiatric Associates, (3) Plaintiff's function report dated November 18, 2009, and (4) notes from a consultative exam with Dr. Johnson. (DE 10, p. 15). Substantial evidence supports the ALJ's determination that Plaintiff is not markedly limited with regard to ADL, social functioning, concentration, persistence, or pace, that Plaintiff had no episodes of decompensation of extended duration, and that Plaintiff is not completely unable to function independently outside of her home.

With regard to ADL, Plaintiff testified that she spent her days sleeping and watching television. (DE 10, p. 146). She could administer her medication and count change, bathed regularly, and used the phone several times a week. (DE 10, pp. 147, 150, 301). In 2010, Plaintiff reported that she cleaned all the closets in her house. (DE 10, p. 318). According to Dr. Wright, Plaintiff is independent in self-care ADL, and although her hip pain inhibits certain activities, the "quality, frequency, independence and appropriateness of these functional activities are not significantly compromised by psychologically based symptoms." (DE 10, p. 301). Neither Dr. Singh's notes nor notes from StoneCrest Family Physicians indicate marked limitations in ADL.

Substantial evidence supports the ALJ's conclusion that Plaintiff's social functioning capacity is not markedly restricted by her mental impairments. Although Plaintiff testified that her fear of leaving the house stemmed from a car-jacking (DE 10, pp. 31, 36), the ALJ

determined that the impact of this incident was not as significant as alleged because the medical record makes no mention of its occurrence. (DE 10, p. 15). Further, even though Plaintiff has a history of interpersonal conflicts with her children,[14] Dr. Singh's notes about these incidents indicate that they were provoked, not caused by Plaintiff's mental impairments. These include instances in which: Plaintiff's children did not listen to her (DE 10, pp. 195, 249), Plaintiff's children relied on her for housing and financial support (DE 10, pp. 188, 193), Plaintiff's son shouted, howled, and broke a bed (DE 10, p. 319), Plaintiff's son "thrashed" her (DE 10, p. 185), and Plaintiff's daughter bickered with her (DE 10, p. 184). Plaintiff has an ongoing relationship with her husband, and he supported Plaintiff's decision to sever ties with her children. (DE 10, p. 184). Dr. Wright reported that Plaintiff can appropriately interact with the public, supervisors, and co-workers with moderate limitations at most. (DE 10, p. 305). This opinion coincides with Ms. Hobock's determination that Plaintiff's social interaction abilities were only moderately limited. (DE 10, p. 154).

Substantial evidence also supports the ALJ's conclusion that Plaintiff's concentration, persistence, and pace are not markedly restricted by her mental impairments. Dr. Wright determined that Plaintiff is only moderately limited in this aspect, concluding that Plaintiff can understand, remember, and concentrate on simple and detailed 3-step tasks for at least two hours in an eight-hour day with moderate limitations. (DE 10, pp. 299, 305). Ms. Hobock also concluded that Plaintiff is moderately limited regarding concentration, persistence, and pace. (DE 10, p. 154). The ALJ further noted that Plaintiff reported watching television most of the day, "suggesting less than marked limitations in this domain." (DE 10, p. 15).

Finally, substantial evidence supports the ALJ's finding that Plaintiff did not meet the decompensation requirement. According to the medical record, Plaintiff only experienced brief

---

[14] (DE 10, pp. 179-180, 184-185, 188, 190, 193, 195, 249, 317, 319).

episodes of decompensation in November 1997 and July-August 2010. (DE 10, pp. 233, 319). Plaintiff also told a consulting doctor, Dr. Farooque, that she had never been hospitalized for psychiatric treatment. (DE 10, p. 329). Additionally, Dr. Wright noted that Plaintiff had no episodes of decompensation of extended duration. (DE 10, p. 299).

As for Listing 12.06 requirement (C), substantial evidence supports the ALJ's conclusion that Plaintiff is not "completely unable to function independently outside of her home." Neither of Plaintiff's treating physicians reported such an impairment. Dr. Wright concluded that the evidence did not establish the 12.06(C) criterion. (DE 10, p. 300). Further, Ms. Hobock did not identify this restriction on Plaintiff's vocational analysis worksheet. (DE 10, pp. 154-156). Instead, Ms. Hobock identified three jobs Plaintiff could perform, suggesting that Plaintiff can function independently outside of her home. (DE 10, p. 156).

### 2. Plaintiff's PTSD Is Not a Severe Impairment

To proceed past the second step of the five-step disability test, the claimant must prove she has an impairment or a combination of impairments so severe that it prevents her from engaging in SGA. 20 C.F.R. §§ 416.920(a)(4)(ii),(c); SSR 85-28. Mere abnormalities with little effect on an individual's physical or mental abilities to perform basic work activities are "non-severe." 20 C.F.R. § 416.921(a); SSR 85-28.

The ALJ concluded that Plaintiff has the following severe impairments: bipolar disorder, anxiety disorder, migraine headaches, and left hip spurs. (DE 10, p. 14). Plaintiff asserts the ALJ should have listed her PTSD among her other severe impairments. (DE 12-1, pp. 9-10).

Although the ALJ did not specifically refer to Plaintiff's PTSD in his decision, substantial evidence supports a "non-severe" determination. From the hearing transcript, it is evident that the ALJ was aware of Plaintiff's PTSD claims. He directed several questions at

Plaintiff regarding her PTSD development and symptoms (DE 10, pp 35-36), and he referenced the alleged symptoms in his decision. (DE 10, p. 16). Plaintiff's treating psychiatrist, Dr. Singh, is entitled to great deference, and Dr. Singh's notes do not hold that Plaintiff's PTSD prevents her from engaging in SGA. *See* 20 C.F.R. § 416.927(c)(1)-(2). Dr. Singh noted an impression of PTSD only twice from 1997-2011, both times in 2002. (DE 10, pp. 214-215). Apart from these reports, however, Dr. Singh did not indicate that Plaintiff's PTSD limits her capacity for SGA.

Further weighing against a finding of "severe" is the fact that Plaintiff did not claim PTSD in her SSI application or three Disability Reports. (DE 10, pp. 66, 125, 132, 158). The date of PTSD onset is also unclear, as Plaintiff gave conflicting timeframes in her hearing testimony and in her motion for judgment on the administrative record. Whereas Plaintiff testified at her hearing that her PTSD began after she was victimized in a car-jacking around 2001-2002 (DE 10, pp. 35-36), Plaintiff's brief claims the PTSD arose from her childhood history of sexual abuse. (DE 12-1, pp. 9-10).[15]

### 3. The ALJ Was Not Required To Call a ME To Testify

The Commissioner ultimately determines whether an individual has a listed impairment or the equivalent of a listed impairment. 20 C.F.R. § 416.927(d)(2). Generally, ALJs are authorized, but not required, to request and consider a ME's professional opinion. 20 C.F.R. § 416.927(e)(2)(iii). However, ALJs must obtain an updated medical opinion from a ME when:

> (1) no additional medical evidence is received, but in the opinion of the ALJ or the Appeals Council the symptoms, signs, and laboratory findings in the case record suggest that a judgment of equivalence may be reasonable; or

---

[15] Even if this Court found error in the ALJ's "non-severe" determination, remand would be unnecessary. The ALJ ultimately determined that Plaintiff suffered from at least one "severe" impairment (DE 10, p. 14), and thus Plaintiff met her burden at step two of the disability determination process. Following, the severity of Plaintiff's PTSD at this stage has no effect on the overall disability determination.

>   (2) additional medical evidence is received that in the opinion of the ALJ or the
>       Appeals Council may change the State agency medical or psychological
>       consultant's finding that the impairment(s) is not equivalent in severity to any
>       listed impairment.

SSR 96-6p. Essentially, SSR 96-6p only requires an updated medical opinion when: "(1) the record may support a judgment of equivalence or that (2) the state agency consultant might have concluded the claimant's impairments equaled a Listing had additional evidence been available to him or her." *Lyke v. Astrue*, 3:08-CV-0510, 2011 WL 2601429, at *6 (M.D. Tenn. June 30, 2011); *see also Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 723 (6th Cir. 2012).

Plaintiff claims the ALJ erred when he did not call a ME to determine whether Plaintiff met or medically equaled Listing 12.04 and Listing 12.06, discussed *supra* at pp. 14-16. (DE 12-1, p. 10).

Despite Plaintiff's arguments, the ALJ's decision not to call a ME is supported by substantial evidence. At no time during the hearing did the ALJ state or suggest that a finding of equivalence was appropriate. To the contrary, the ALJ's decision was consistent with the consultants' assessments that Plaintiff's impairments were at most moderate. Addressing the second factor, the ALJ considered the additional information Plaintiff provided at the hearing—referring to a car-jacking—and impliedly determined it would not have affected the consultants' findings. The consultants were already aware of Plaintiff's PTSD, headaches, and agoraphobia, which allegedly stem from the car-jacking. Consequently, the ALJ was not required to call a ME.

### 4. The VE's Testimony Did Not Conflict with the DOT

At the fifth step of the disability determination process, the ALJ considers vocational information from the DOT and the VE. 20 C.F.R. § 416.966(d)-(e); SSR 00-4p. When a VE testifies at a hearing, the ALJ must (1) ask if the VE's testimony conflicts with the DOT, (2)

elicit a reasonable explanation for any conflict before relying on the VE's testimony, and (3) explain the resolution of the conflict in the ALJ's decision. SSR 00-4p.

Plaintiff does not dispute that the ALJ satisfied the first requirement. (DE 10, p. 49; DE 12-1, p. 12). At issue is whether the ALJ violated SSR 00-4p by not seeking an explanation when the VE confirmed that her testimony was consistent with the DOT "other than the sit-stand option." (DE 10, p. 49; DE 12-1, pp. 11-13).

The ALJ did not err. Although the DOT does not refer to "sit-stand" options, this Circuit does not consider VE opinions regarding "sit-stand" options as contradictory to the DOT. *Smith v. Astrue*, 3:10CV1829, 2012 WL 1232272, at *11 (N.D. Ohio Apr. 12, 2012) (quoting *Creque v. Astrue*, No. 4:10-CV-1528, 2011 WL 4054859, at *5 (N.D. Ohio Aug. 18, 2011). Accordingly, the ALJ had no conflicts to resolve under SSR 00-4p.

### 5. The ALJ Appropriately Assessed Plaintiff's Testimony Under SSR 96-7p

Complaints of pain or other symptoms are evaluated in a two-step process. 20 C.F.R. § 416.929(a). After (1) establishing whether the claimant suffers from a medically determinable impairment which reasonably could be expected to produce the alleged pain or symptoms, the ALJ must then (2) evaluate the extent the pain or symptoms limit the claimant's ability to work. 20 C.F.R. § 416.929(b)-(c); SSR 96-7p. With regard to the second factor, the ALJ will consider: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of medication taken to alleviate pain or other symptoms; (5) other treatment used to relieve pain or other symptoms; (6) other measures used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restriction due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3); SSR 96-7p.

The ALJ decides whether the claimant's statements are credible. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). When making this decision, the ALJ considers "contradictions among medical reports, claimant's testimony, and other evidence." *Id*. at 543 (quoting *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997)). Because the ALJ had the benefit of interacting with the claimant during the hearing, the ALJ's credibility decisions are given great weight so long as they are supported by substantial evidence. *Id*. at 542.

At issue is whether the ALJ properly evaluated and assessed the credibility of Plaintiff's testimony under SSR 96-7p. (DE 12-1, p. 14). A reading of the ALJ's decision shows that his credibility determination was consistent with the procedural requirements of SSR 96-7p and is supported by substantial evidence.

The ALJ first determined that Plaintiff had medically determinable impairments which could reasonably cause the alleged symptoms. (DE 10, p. 18). Since the record did not contain objective medical evidence of an injury capable of producing Plaintiff's foot, ankle, and back pain, the ALJ correctly ruled that these particular pains were "not medically determinable." (DE 10, pp. 14-16).

After recognizing that Plaintiff had medically determinable impairments, the ALJ concluded that Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with Plaintiff's RFC. (DE 10, p. 18). This conclusion is based on a thorough review of the record and is supported with substantial evidence.

Using reports from Plaintiff's treating physicians, the ALJ addressed the factors that affected Plaintiff's symptoms and RFC, noting that Plaintiff treated her headaches and migraines with Imitrex, benefited from continued efforts to find a right medicine combination to relieve her

other symptoms, systematically suffered from stress and anxiety when coping with family-related interpersonal problems, and reacted poorly to weight gain. (DE 10, pp. 16-18). The ALJ also addressed Plaintiff's car-jacking testimony, finding that the impact was not as severe as alleged because the record contained no mention of the "major traumatic event." (DE 10, pp. 15-16). Considering the record chronologically, the ALJ concluded that "the emotional struggles are the exceptions and 'doing well,' is the rule." (DE 10, p. 17).

Plaintiff's credibility is further challenged by her inconsistent statements about her PTSD onset date, discussed *supra* at p. 19. Although the ALJ did not comment on this discrepancy, Plaintiff first testified that she developed PTSD after a car-jacking. (DE 10, pp. 35-36). She now claims in her motion that her PTSD stems from sexual abuse as a child. (DE 12-1, pp. 9-10). Whether these events actually transpired is ultimately irrelevant, for the contradicting testimony, in addition to the ALJ's findings above, supports the ALJ's determination that Plaintiff's statements are credible only so far as they support her RFC.

## IV. CONCLUSION

For the reasons stated above, the Magistrate Judge hereby **RECOMMENDS** that Plaintiff's Motion for Judgment on the Administrative Record (DE 12) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from receipt of this Report and Recommendation within which to file with the District Court any written objections to the proposed findings and recommendations made herein. Any party opposing shall have fourteen (14) days from receipt of any objections filed regarding this Report within which to file a response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of

further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

     **ENTERED** this the 3rd day of July, 2013,


                                   /s/ Joe B. Brown
                                   Joe B. Brown
                                   United States Magistrate Judge